Welcome to the Fifth Circuit Court of Appeal. We'll call the first case for oral argument this morning. United States v. Noble U. Ezukanma. We'll hear first from Ms. Rudman. Good morning and may it please the Court. I'm Jody Rudman on behalf of the appellant, Dr. Noble Ezukanma. There are three main issues that we briefed in our briefs. If it pleases the Court, in the interest of time this morning, I'd like to focus on two of those. The first is the insufficiency of the evidence to support Dr. Ezukanma's convictions, and the second is errors at sentencing. First with regard to the convictions, the government indicted this case as a conspiracy to defraud Medicare in two ways. The first is through the submission of up-coded claims for physician visits in Dr. Ezukanma's name, and the second is home health certifications that Dr. Ezukanma supposedly signed fraudulently because he didn't have sufficient knowledge of patient conditions, and those are shorthand referred to as Form 485 certifications. The record at trial and the reasonable inferences to be taken from the record are insufficient to prove that Dr. Ezukanma agreed to do either one, much less with the intent to defraud Medicare. Starting first with the up-coding issue, the government brought to trial 14 witnesses. Eight of them were investigators and search warrant custodians and an expert witness. Six were lay witnesses, and of those six, there was only one whose testimony could even have provided a link between Dr. Ezukanma and Myrna Parcon's billing fraud, and that one witness was Myrna Parcon's biller in the early years, Glenda Lydia. All that Glenda Lydia could say was that Myrna Parcon and Edgar Santiago talked about billing at meetings. That's all she said, and this is important because what she said was not that Myrna and Edgar sat around at meetings and talked about billing fraud or cooked up a nefarious scheme to submit bad billings to Medicare. Instead, what she said was that they were going to submit the extra codes because they were educating patients and that they were going to submit the highest codes because they felt their bills equaled out to those services. She felt the codes equaled those services. What is it, in the record, about those meetings and what your client was doing at those meetings? Is this a meeting he was attending or was he just in a room where lunch was being served and these discussions were going on? Well, that's just it, Judge Southwick. The only evidence, the only testimony was that he was there. He was merely present. Well, what is the testimony about what the meeting was? Was this a formal meeting for discussions of whatever their nature were to be presented to the people who were at this room? She didn't describe in great detail what the meetings were. There is some indicia in the record that at the meetings, people would bring patient charts and they would talk about their care of patients. But beyond that, her only testimony was that people were eating lunch and people were talking and people were coming in and out and that Dr. Ezekanma might have been at three of these meetings and then there's this business about Myrna Parkone and Edgar Santiago talked about what that was. And, of course, then she said that their discussions about billing, and this is at 1103 and 1107 of the record, were merely that they were going to educate patients and that they felt their visits equaled the highest codes. So you have mere presence and you have an insufficient basis on which to hold that there was a discussion of fraudulence. Well, we've got in there a lot more evidence than that. I mean, was it $350,000 went to his bank account, money went to a foreign country where he was renting a house, 30 or 40 factors a day would come? So Dr. Ezekanma was the medical director for USPHB, Myrna Parkone's business, and Dr. Ezekanma earned a salary of $5,000 a month and he served in that role, if you take the entire length of the conspiracy, for 2009, 10, 11, 12, and then I think a bit of 13. So at $5,000 a month, he was earning an income from this place for serving as medical director. Then on top of that, Dr. Ezekanma was performing services for Medicare beneficiaries, and so he was being paid for his physician services to those Medicare beneficiaries. So that accounts for the $350,000 he made in income from this organization. I don't know. The government was never able to tie at trial whether this money to Nigeria was actually for Dr. Ezekanma, for some other purpose, it was just sort of mentioned that money went to Nigeria, but there's no indication that that was in some way connected to Dr. Ezekanma except he's from Nigeria. That's all there was on that. With regard to... He certified that he was supervising other health care providers when in actuality he was not. Well, he did certify that he was supervising other health care providers in the signing of the 485s that the other health care providers had given the face-to-face visits on. But the testimony in the record is not that he was not actually supervising those providers. Gabriella Udabor, who was the nurse practitioner who had done the services that formed part of the substantive counts, Gabriella Udabor said, Dr. Ezekanma was available, I spoke with him, he answered questions. And two witnesses at trial, that's Dr. Itindi, one of the co-conspirators who testified, and then Investigator Burkhead, both... Well, Investigator Burkhead testified that Dr. Ezekanma told him, yes, indeed, I am supervising other practitioners. Dr. Itindi and then Agent Stapleton from the HHS both described what it means to supervise and said supervising means a review of charts and availability to speak with providers when they need you to speak with them about patient care. But there were other times he was supposed to be physically present and he was not. That's the problem. The government equated a face-to-face visit for home health certification purposes with a need for the physician to have a face-to-face contact with the patient. That's not what the Medicare regulation is. That's not what the Medicare regulation was. And so Dr. Ezekanma's presence or lack of presence to conduct face-to-face certification exams is not in any way violative of Medicare regulations. The regulations required face-to-face visits for the first visit, right? Starting in 2011, after the passage of the Affordable Care Act, the regulation changed in such a way that a physician certification had to be accompanied by a face-to-face documented form. That face-to-face form didn't have to be filled out by and that visit didn't have to be conducted by a physician. It could be filled out by and the visit conducted by a nurse practitioner, a physician's assistant, a certified nurse midwife, a clinical nurse specialist. So whether Dr. Ezekanma conducted those face-to-face visits after the law changed or not is irrelevant. He could sign the certification premised upon the visits conducted by other people. I want to make sure that I... Didn't he have to spend something like 75 minutes in order to charge the highest code? Can you clarify that for me? Sure. It is true, I believe, that the government's witness, Donald Large, testified that the with a patient. Whether Dr. Ezekanma knew that or whether Dr. Ezekanma knew that bills were being submitted for that code when those visits weren't necessarily equating to 75 minutes is another issue. And there's no evidence in this record, there's no testimony at trial that Dr. Ezekanma knew that code was submitted, that Dr. Ezekanma knew what that code meant, and that Dr. Ezekanma wasn't, in fact, well of the belief that his visits equaled the codes that were being submitted for his services. Isn't he presumed to know the law? He's presumed to know the law, yes, but coding is another issue entirely, and the testimony at trial is that he didn't know anything about coding, that for his whole medical career he had had other people do the coding and billing for him because they were the experts on coding and billing issues and he was not. And the issue here is not lax practices or negligent billing. Gonshi tells us that that's not enough, that's not tantamount to an intent to defraud. But it seems when you look at the circumstantial evidence, for example, on one day that he billed 80 hours of time for a 24-hour period, and that was — there were other instances where during a 24-hour period he would — his services were billed out way beyond that. Well, that's the problem, Your Honor, is the way you just articulated it is correct. His services were being billed at that. The issue is, did he know? Well, the money went — a lot of money went into his accounts over which he was a cosigner. A lot of money went into accounts over which he was a cosigner, that's correct, but that doesn't equate to him knowing that that money was coming in because bills were being submitted fraudulently in his name. And he, having never participated in any discussion of nefarious billing activities and not being someone who knew about what this billing meant, couldn't have looked at a bank statement and said, hmm, I can destroy it. Who stood to gain — who, other than he, stood to gain from these billing practices? He did profit by them. I assume that's undisputed. Well, he was paid his salary, yes. There were owners of the organization, certainly Myrna Parkone herself and her co-conspirators, all of whom pled guilty. I don't know what sort of income they made, but in a $38 million Medicare fraud scheme, this man gets a salary of $350,000. We have to presume a lot of other people made a whole lot more money than he did by virtue of his salary. I want to make sure in these last few minutes that I have an opportunity to turn to sentencing unless the Court has additional questions on the other issues. If the Court declines to reverse the convictions of Dr. Rezuconma, at a minimum, Dr. Rezuconma's sentence should be vacated and remanded because that sentence was imposed in error. And here the issue is the District Court's methodology for calculating loss and imposing Dr. Rezuconma's sentence. That sentence was not supported by the law. That sentence was not supported by a factual record. And that sentence was not supported by this Court's precedent. The issue legally is that the government came in with this theory that every single one of these dollars paid on every single one of these claims was all per se fraudulent because of what the government called the backwards referral process. In other words, because referrals for home health care generated with home health agencies, somehow that rendered them suspect and even fraudulent. But the problem is, at trial, at sentencing, in its brief before this Court, the government has never shown, never articulated why, where. There is no Medicare regulation that says you may not have a home health referral generate with a home health agency. And in fact, the Court nine months ago in Ganji recognized that's not a legal requirement. The statement in Ganji is usually, although not a legal requirement, a patient primary care physician refers her for home health services. So the whole theory of why all of this was fraud because of backwards referrals is a theory that is incorrect. On the factual basis, the agent who testified at sentencing had done no more than a rather minimum effort to try to figure out and to try to ascribe to Dr. Resuconma proper fraud amounts. What he had done was interview out of 4,200 Medicare beneficiaries, 20. He interviewed 20. And he said. Twenty? Yes, sir. He interviewed 20. That's all. And then he looked at the patient records and he said, well, I'm just going to extrapolate that all the claims are fraud because I don't see in the patient records that the codes are supported. So he takes these sweeping presumptions on the basis of a very limited factual investigation and says, I'm going to call it all fraud. And who is this? This was Agent Stapleton who testified at sentencing. He's an HHS agent. And I would point out for the court that he's neither an expert, nor a doctor, nor a biller, nor anyone with any medical training. What is HHS specialty? It's the Department of Health and Human Services. And, of course, they do specialize in investigating Medicare cases, among others. Doesn't make him an expert in how to bill and how to code and how to read charts and how to know what services patients are truly eligible for. But to have looked at merely a fraction of those charts and then determined, well, I guess the charts don't support the claims, they all must be fraud, is an insufficient factual investigation under this court's precedent in Izuela and Mahmoud and Imo to determine that these are fraud amounts that properly belong on this defendant's shoulders. In coordination with that, the district court's finding of pervasive fraud as a means to extricate itself from the problem of an insufficient factual record was also erroneous. One doesn't get to just wave a wand over a lot of claims and say, well, it all looks pervasive to me and, therefore, we're just going to excuse the government from bearing its burden. A pervasive fraud finding has to be made on the basis, this is how the court announced it in Hebron in 2012, has to be made on the basis that the fraud is so pervasive that extricating the legitimate from the fraudulent claims isn't possible. It's not reasonably practicable and that wasn't done here. How many claims are involved here? 4,200 beneficiaries. Okay. How many of those would you say this court would have to determine to be fraudulent before we could invoke that presumption? Well, I've thought about that a lot, Your Honor, and I can't come up with a particular number, but I would suggest this. At a minimum, you have to talk to more than 20 beneficiaries, especially when you know that the claims, that the files themselves are insufficient, talking to more than 20 beneficiaries, looking at certifications, would be more than adequate. We know that he allowed other people to use his provider number. We know that more hours were billed than there were hours in the day routinely. There's a lot of evidence that there was pervasive fraud, it seems to me. I see that I'm out of time. May I answer your question? Uh-huh. The problem is, Your Honor, knowing that those things happen doesn't mean knowing that Dr. Ezucanma knew that those things happened. Well, assuming that he knew and that we're just talking about sentencing, it seems like there's certainly a lot of evidence that there was pervasive fraud. Well, there's a lot of evidence that there was a lot of money at stake, a lot of claims at stake, Medicare paid a lot of money on those. But that doesn't necessarily make it pervasive,  under these circumstances, when it's just not possible to separate... Lots of things that were just not possible in the records. But there's no indication that it wouldn't have been possible or even practicable to figure out what really belonged in Dr. Ezucanma's corner versus what really didn't. And it starts with talking to the beneficiaries. We know the beneficiaries that he treated. There's an exhibit at trial that actually lays out which beneficiaries he saw. If he's alleged to have signed these certifications, look at them. Take a look at them and see whether he actually signed them. The agent never did that. They just waved a wand over it all and called it pervasive because it looked like a lot of money. I'm out of time. Thank you so much. May it please the court, Fanula Tessier on behalf of the United States. Ample evidence supports the jury's verdict that Dr. Ezucanma was guilty of conspiracy to defraud Medicare and six substantive counts of Medicare fraud. Now there's little dispute that U.S. physicians executed a massive conspiracy to defraud Medicare. This fraud happened in two ways. First are the bills submitted by U.S. physicians, a physician home visit company. U.S. physicians billed Medicare for thousands of visits that were purportedly but not actually performed by Dr. Ezucanma, that were medically unnecessary, and that were far shorter, 15 to 20 minutes, than would justify the submitted billing codes representing 60 to 90 minute visits. Richard Shutt, one of the physician's assistants who actually performed the visits, said that he thought at first that he was visiting patients to serve as a kind of primary care physician, but quickly realized that in fact the only purpose of these visits was to sign home health certifications so that the home health agencies who were referring the patients to U.S. physicians could then go out and bill Medicare for unnecessary home health services. That's the second part of the fraud. Dr. Ezucanma denies any knowledge of the scheme or any intent to further it, but the evidence says otherwise. Three separate witnesses testified that Dr. Ezucanma knew that U.S. physicians was billing for visits he did not perform. He admitted as much to an investigator for health integrity, a Medicare contractor. What did he actually admit? He admitted that he knew that U.S. physicians was billing for visits that he did not perform. He admitted that to Denson-Burkhead. He also stated that the visits he did perform were only about 30 minutes long. He also... Did he know that they were billing for more than 30 minutes? The jury could reasonably infer that from a number of pieces of evidence. First of all, Glenda Lydia, who is a U.S. physician employee, testified that he was present at meetings where Myrna Parkhan said that we are going to be billing at the highest the extended billing codes. She also testified... I think it was the same meetings we were just talking about earlier with your friend on a little bit unclear as to their purpose and what his role was at these meetings. The evidence as to his purpose at the meetings is not entirely clear, but Glenda Lydia was clear in her testimony that he was present at them and that nurse practitioners talked about the visits they were going to be performing and that Myrna Parkhan said we're billing at the highest billing code. But the Court need not rest on that evidence alone. That doesn't make the highest billing code improper. Where is the evidence that he knew that the highest billing code was not legitimate? Well, first of all, he testified that when he visited that he spent a lot less time than that. In addition, if you review the patient files and there were patient files submitted at trial including for the six substantive counts, it's fairly clear from those patient files that the patients did not need home physician visits at all. And the evidence also, in addition to the fact that the visits were shorter than they purported to be, the records also had to show that a home physician visit was necessary. Medicare does not pay for doctors to visit in the home unless the patient is unable to get to the doctor's office. And the patient files indicated that some of these patients, for example, had visited their doctor's office the week before or had a visit scheduled for a couple of weeks later. Some of the counts, count two, patient GS, the notes in her patient file said that she's quote, doing all right and voices no problem for the patient in count three. Her note said that it was a well check and she had no history of illness and had recently gotten medicine from her primary care physician. Count four had no symptoms, had quote, just smoked and was working out. Count five had no acute symptoms. Count six, no acute symptoms, scheduled to see her primary care physician only eight days later. Count seven, no acute symptoms, doing well and visited a doctor the day before. The patient files made clear that these patients not only did not need a 90-minute or a 75-minute home visit, but needed no home visit at all. And Dr. Ezenkama kept track of the money, not just the money that was being paid into the UNEC and U.S. Physicians Bank accounts on which he was a cosigner, but he also kept track of payments to the nurse practitioners. One of the documents found in his house was a check register with payments to Gabrielle at six and seven. This is at pages 1499. How does that show that he knew that there was anything improper about payments to her? It's not that the payments to her were improper. It shows that he knows that she is making visits to the patients and that U.S. Physicians is billing for visits that he purportedly performed, but were in fact being performed by a nurse practitioner. Now, there was a lot of discussion about the face-to-face certification and whether or not you could rely, a doctor could rely on a visit by a nurse practitioner. And while it is true that Medicare passed a regulation saying that for home health certifications, which remember is the second part of the fraud, that for home health certifications, a doctor could certify home health for a patient based on the face-to-face visit for a nurse practitioner. The record is also clear that you cannot bill for a physician home visit based on a, that's at 1074 of the record, Agent Stapleton testified to this, a nurse practitioner can bill under a doctor's number for work done in an office under the doctor's supervision, but cannot bill under a doctor's number for work done at the home. What you're talking about now, though, it seems to me is consistent with what we heard from the other side and in the briefing, that it's one thing to say what in fact is the right approach to the billing, the right way to certify these, it's something else entirely to know that whether the defendant was aware of that. And so far, basically what I'm hearing in this presentation is pretty good reasons to believe that what the underlying fraud that was going on was indeed fraudulent. But I don't see where much of what you're saying is really tying the doctor's knowledge to that. Well, this court has looked to a number of factors to determine whether or not a jury could reasonably infer intent to defraud, including the defendant's position in the organization, his profit from the fraud, and the existence of highly unusual billing practices. As to the billing practices, U.S. physicians billed 99 percent of its patients at extended billing codes, often billed for more than 24 hours of visits in a day. And Dr. Elzenkama referred 97 percent of his patients for home health services. He played a leading role in U.S. physicians. He wasn't simply the medical director. He was an owner and chairman of the board. He was entitled to a share of the profits, as well as a per-patient visit, and he was a cosigner on the bank accounts. And he did, in fact, profit from the fraud, being paid over $350,000 over the course of the conspiracy, from doing little more than signing patient forms without reviewing files. I'd also note that there's testimony that he, in fact, signed the Form 485s without reviewing patient files and determining whether or not the home health services were medically necessary. Ransom attendee testified that he took over that job from Dr. Elzenkama and that he signed stacks of paperwork, he said, as thick as a binder. He would just bring it home and sign, sign, sign. And Loretta Borland, who is an employee of Dr. Elzenkama's at his pulmonary practice, said that they would get, at the pulmonary practice, they would get 20 to 30 faxes a day, including home health paperwork, for patients of U.S. physicians, and that she saw Dr. Elzenkama sign stacks of paperwork without ever looking at patient files. And from that evidence, the jury could reasonably infer that Dr. Elzenkama was, knew that the patients did not, in fact, need home health services. And, in fact, if he had, either he didn't look at the files at all, in which case, he was, did not care, he was certifying without regard to whether or not they needed the home health services, or if he had, in fact, looked at the files, which I would encourage the were at pages 11, 3, 5, 4, to 12, 1, 7, 6 of the record. Those files make abundantly clear that these patients did not need home health services. And his name is, in fact, all over those patient files. Richard Shutt and Gabrielle Udebor both testified for counts two through seven that they were the people who actually performed the visit, that Dr. Elzenkama was their supervising physician, but that he never spoke to them or rarely spoke to them about patients. Richard Shutt testified the very first time that he spoke to and met Dr. Elzenkama was at a holiday party six weeks after he started at the company. And Udebor testified that he spoke to her only two or three times. Udebor further testified that when she tried to discharge patients from home health services, she was told not to do that. Told by whom? She was told by Myrna Parkhan, but I think a jury could reasonably infer from that, because Dr. Elzenkama was, in fact, her supervising physician and the person responsible for certifying the patients for home health care services. And, in fact, the one who, according to Medicare, was supposedly doing these home visits. I also, I've been remiss in not noting the thousands and thousands and thousands of pages of Medicare remittance notices that were found in Dr. Elzenkama's home. They were highlighted. They had notes on them. They showed the upcoded, they showed the billing codes that were being submitted. He not only tracked the payments, the bills to Medicare through these Medicare remittances, he also tracked payments by patient. He had one document that showed Medicare Part B summaries for several years. That's at page 12802 to 12820 of the record, highlighted with handwritten notes on it, including a reference to the patient at issue in count six. So, and for sufficiency of the evidence, the question is only whether a reasonable jury viewing the light, viewing the evidence in the light most favorable to the jury's verdict, whether a rational jury could determine that he had an intent to defraud Medicare. And on this record, given the testimony of the witnesses who stated that he knew Medicare was billing under his Medicare provider number for services that he wasn't performing, that he'd been contacted by an investigator and continued to engage in that practice for two more years. I may have missed this, but did you speak to whether or not he recovered monies other than his salary from this scheme? He was a co-signer on the bank accounts. In addition to being a co-signer on the bank accounts, the government tracked payments of $350,000 to him during this time. Now, during this time, really all he was doing was signing paperwork without actually determining whether or not the patients were eligible for home healthcare services. And he was billing Medicare for that time. That was an additional part of the fraud. Medicare wasn't just billed for visits that he purportedly performed but did not, but was also billed for time that he purportedly spent reviewing the patient's files and then creating what is called a plan of care, which is necessary for home health services, and then actually overseeing that plan of care. And the nurse practitioner and physician assistant who testified said that he didn't do that work. All right. How much money went to him in what increments over what period of time? To him personally, the government was able to track $350,000 that went to him personally. How much, in what denominations and how frequently over how many years? It was over approximately a three-and-a-half-year period. And if I recall correctly, it was about $5,000 twice a month. There was a number of other payments. He wasn't just, he was paid from a number of different companies and he was paid in a number of different ways. Amongst payments is he was paid for a Mercedes. There were payments to an individual who had sold or purchased a Mercedes. There were some cash payments. There were payments from Primary Angel and Essence Home Health, which were the two other home health agencies that were affiliated with Myrna Parkon. There were payments directly from U.S. physicians. But was that part of the $350,000? It is. That's correct. And there is a... Where did all the money, where did the $38 million go? Who got the most? So the $38 million, $7 million, so $38 million was the loss amount at sentencing. That included both the intended loss for U.S. physicians and the actual loss for the home health agencies. Restitution was set at $34 million. That was the actual loss. $7 million of that went to U.S. physicians, which was the physician home visit company that Dr. Ezenkama owned with Myrna Parkon. Of that money, I think a certain amount of it went to pay the nurse practitioners who did the visits. And then some of the money went to the other co-conspirators. The remaining money, the $25 million or thereabouts, went to the home health agencies that referred their patients  So he was, the court attributed that loss to him at sentencing because he was the certifying physician for all of those unnecessary home health services. And I'd just like to note as to sentencing, the defendant claims that the government basically did almost no investigation to determine the pervasiveness of this fraud. But I don't think that accurately reflects either the trial record or the record at sentencing. The case agent testified at sentencing that he reviewed over a thousand patient files, all the patient files that they were able to obtain. And he said that those files did not support any of the home health services. He said that the patients were not getting any benefit from the home health services and it appeared as though often the home health services had never been provided. He said notes, he looked at the notes from the actual home health visits and they were copied or backdated. Ransom attendee also had expressed some concern that the home health visits were actually not taking place. Well, have we given any guidance or is there guidance on how, percentage-wise or otherwise, how the government is to go about bringing a sample that is sufficient for calling the entire scheme a fraud? Your counsel on the other side wasn't willing to give us a number. Is there anything in the case law that gives us a way of deciding how intensive the investigation must be? The court has not indicated any kind of percentage or absolute numbers. And of course, percentage would make it, the greater the fraud, the more difficult burden for the government. I think here there's no question that the government met its burden in that the government reviewed all thousand of the patient files that it was actually able to obtain. And then interviewed 20 of those beneficiaries. That is, I think, as Nkama would ask, that the government have interviewed a thousand patients, which is, of course, the question is whether that is reasonably practicable. And that is not reasonably practicable. I'd also note that this isn't an irrebuttable presumption of pervasive fraud. The defendant can, of course, come back and provide evidence that, in fact, the fraud was not pervasive. For example, by taking a random sampling of patients and looking at them and saying, actually, this random sampling of patients shows that there was only fraud for a small percentage of them. Or even by showing that some number of patients actually needed the services that they were provided. Is there any indication that more than 20 patients were talked to, but only the 20 become the presentation by the government? What concerns me is maybe they talked to 40, and the other 20 didn't make a very good support for the case that was meant to be brought. So is there evidence that the 20 patient files and patients who were interviewed are the only ones who were interviewed by the government? I think the agent was asked how many patients he interviewed, and he said 20. I don't think he was asked, did you interview anybody else? But I think the implication from that is that those were the 20 patients that he interviewed. It seems hard that something like this, it wouldn't be through mere serendipity, some patients who needed home health care. And I would not know what that percentage is, but unless the evidence is what it is, you can proceed. That's correct, Your Honor. But the agent also testified that he reviewed 1,000 patient files, and that reviewing those 1,000 patient files, he said that the patients did not, in fact, need home health services or physician home visits. I also think this Court can take comfort. How did he know that? I'm sorry? How did he know that the 1,000 did not need home care? From reviewing the patient files, because the patient files, the conditions of the patient in the files indicate that they did not need home health services. Note Donna Large testified at trial. She only reviewed 10 files, but she said that they were the, quote, worst records she'd ever seen. She said if she were very generous, one or two files might be payable at the lowest level of an office visit, but not a single one supported a home visit. And she noted that many had no complaints of acute symptoms at all. Did the defendant introduce any rebuttal evidence to rebut the 20 patients who the government found to be fraudulent patients? At sentencing, the defendant introduced some evidence from an expert, but the Court did not credit that evidence, and the defendant has not raised that evidence on appeal and not argued from that evidence on appeal. So to the extent, and to be clear, the defendant's argument is not that he properly rebutted any presumption that every bill was intended to be fraud. His argument is that that presumption never should have arisen in the first place. And the fact that 97% of Dr. Ezenkama's patients were referred for home health services and that the patient files, the 1,000 patient files that the agent was able to review indicated to him that the patients did not need home health services, I think was sufficient to establish the pervasiveness of the fraud. I see I am out of time, if the Court has no further questions. Thank you. Thank you, Ms. Teixeira. You have five minutes on or above. Thank you, Your Honor. I'm going to have to jump around just a little bit. I want to make sure that I address certain points. In particular, one is this notion that Dr. Ezenkama owned U.S. Physician Home Visits. There is no evidence in the record that he owned this company at all. And there is no evidence in the record that he shared in the profits of the company whatsoever. In response to Judge Owen's question, Government's Exhibit 124, which was introduced at trial, and I cannot read the record site because it's covered up by the exhibit sticker, but Government's Exhibit 124 shows that there was $354,000 paid to Dr. Ezenkama total over a five-year period, March of 2009 through May of 2013. I want to jump to sentencing very quickly because what's interesting about this whole idea of rebutting the evidence is that the District Court, though it had held that the loss was pervasive, also stated, and this is in the record, it's 1742, that Dr. Ezenkama had no burden to do anything at sentencing. That Dr. Ezenkama had no burden to do anything at sentencing. So if there was a rebutting that was supposed to happen, it certainly is a surprise to Dr. Ezenkama now and at sentencing and before sentencing when the words pervasive fraud and pervasive loss were never instituted. Maybe he didn't have the burden, but if the evidence was 97% of all of his patients were referred for home health care, did he say that's incorrect or that every single one of those patients qualified for home health? I mean, did he challenge that evidence? He did not. What he did was to challenge the loss findings on the basis that there just wasn't a sufficient basis for putting all $38 million of this in his corner as intended loss and $34 million as actual loss, but he never came forward with any particular evidence one way or the other. He did, this was in a motion for a guideline departure, a variance from the guidelines. He did submit an expert report that talked about his care of 34 patients, but that's the extent of his submissions on that topic. I want to, I said I was going to jump around a little bit and I apologize, but I want to make sure that I also talk about what it was that Dr. Rezuconma said to the investigator, this is on the sufficiency issue, about knowing that bills were being submitted under his name. This is what he said. This is at 1422 of the record. Did he understand that bills were being submitted under his name was the question. The answer, to a degree, to a degree. And the agent investigator, Burkhead, went on to say that the degree to which he understood that was that he had other people making visits in his name, other people making visits for him, I apologize, because he was supervising them. He did not ever tell investigator Burkhead that he knew that there were all of these claims that were being submitted in his name that he had nothing to do with, to a degree that other people were making visits for him that he was supervising. And that is not enough for an intent to defraud Medicare. Did he name those people? Did he name those people that made visits for him? He did not. He didn't? He did not. He did not. I don't know that he was asked, but he did not. Loretta Borland, her testimony, she was the employee who worked at Dr. Rizuconma's pulmonary practice. She did not testify that Dr. Rizuconma signed stacks of certifications that came in over the faxes. That is not her testimony. You'll find this in the record at 1384. This is what she said. Sometimes he would sign some documents that came in over the fax. That's it. Sometimes he would sign some. When asked what documents were faxed in, she actually identified them as durable medical equipment requests, not home health certifications. It was only when pressed by the prosecutor, well, were there home health certifications in the faxes? Oh, yes. And sometimes he would sign some of the faxed documents. She also testified, and this is important, that Dr. Rizuconma took paperwork home with him every night and that she helped him load boxes of paperworks into his vehicle. So Dr. Rizuconma was clearly reviewing- When you look at the records and the patients clearly don't qualify for home health care, if he was reviewing those records, can't the jury infer that he knew they didn't qualify? Well, the problem is the patient files in and of themselves are not going to be the answer to whether the patient's qualified for home health. It's undisputed, and this was Donna Large's testimony, that the patient files are a little less than ideal. So the issue is, was Dr. Rizuconma himself in contact with these patients, in contact with the providers, knowing what these patients needed? In the document that counsel spoke about, which was an exhibited trial, I think it's Exhibit 89, and it's a 12801 of the record, Dr. Rizuconma has got 511 patients listed under his name. He was clearly having contact with patients and would have seen eyeball to eyeball whether they needed home health, how sick they were. So relying on these insufficient records that Myrna Parkone was keeping isn't really going to be the answer on that. I see that I'm out of time again, unless the Court has additional questions. Thank you, Ms. Rutland. Thank you. We'll take that case under advisement and call the next case to be argued.